X FILED ___ LODGED
___ RECEIVED ___ COPY

JUN 17 2008

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY ___________ DEPUTY

REDACTED FOR PUBLIC DISCLOSURE

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

United States of America,

Plaintiff,

v.

1. Daniel Morar; (Counts 1-18)
2. Gheorghe Babeti; (Counts 1-18)
3. Cosmina Bunea; (Counts 1-18)
4. Dorel Irimiciuc; (Counts 1-18)
5. Samuel Dobos; (Counts 1-18)
6. Brandon Azadegan; (Counts 1-18)
7. Cipriano Ionutescu; (Counts 1-18)
8. Catherine Zebarth; (Counts 1-18)
9. Christina Mejia, (Counts 1-18)

Defendants.

CR08-0612 PHX NVW(ECV)

**INDICTMENT**

VIO:

18 U.S.C. § 1343
(Wire Fraud)
Counts 1-6

18 U.S.C. § 1349
(Conspiracy)
Count 7

18 U.S.C. § 1957
(Money Laundering)
Counts 8-17

18 U.S.C. § 1956(h)
(Conspiracy to Commit Money Laundering)
Count 18

18 U.S.C. § 2
(Aid and Abet)
Counts 1-18

18 U.S.C. § 982(a)(1) and (a)(2)
18 U.S.C. § 981(a)(1)(c)
21 U.S.C. § 853(p)
28 U.S.C. § 2461
(Forfeiture Allegations)

THE GRAND JURY CHARGES:

## INTRODUCTION

At the specified times and at all relevant times:

### Cash Back Scheme

1. In a "cash back" scheme, the investor (or home buyer) offers to purchase a property for more than the asking price, and submits a contract to the seller for the inflated price. The seller agrees to the sale because they are receiving their full asking price. Often real estate agents are involved in the transaction and they are aware that the selling price has been inflated.

2. Often a "straw buyer" is used to facilitate the "cash back" scheme. A "straw buyer" is someone recruited by the investor to take out a mortgage in their name and purchase a house in their name. The "straw buyer" would not live in the house nor be responsible for the mortgage payments. In return for their services, the "straw buyer" would sometimes be paid a fee.

3. The investor often prepares a Uniform Loan Application, also known as Form 1003, for the "straw buyer." A lender uses this form to record relevant financial information about an applicant who applies for a mortgage. The investor facilitating the "cash back" scheme falsely represents the buyer's assets and income, conceals mortgages and other debts, and misrepresents sources of intended down-payments and intent to occupy the properties as primary residences. These misrepresentations are made to qualify the "straw buyer" for a mortgage. In signing the loan application, at the direction of the investor, the "straw buyer" acknowledges that "the information provided in the application is true and correct" and that "any intentional or negligent misrepresentation(s) contained in this application may result in civil liability and/or criminal penalties..."

4. A title or escrow company is used in which the subject property is deposited for safekeeping under the trust of a neutral third party (escrow agent) pending satisfaction of a contractual contingency or condition. Once the conditions are met, the escrow agent will deliver the property to the party prescribed by the contract.

5. In preparing to facilitate a real estate purchase transaction, an escrow agent is used to submit to lenders a preliminary HUD-1 known as a "Pre-audit." The Pre-audit HUD-1 lists fees

and payments to be made in connection with the proposed loan and are reviewed by the lender. If the lender approves the Pre-audit HUD-1, funds are wired to the title or escrow company to disburse accordingly. The lender instructions specify that the escrow agent must notify the lender of any material changes to the HUD-1 and receive the lender's approval prior to fund disbursement. After receiving the loan documents and funds from the lender and facilitating the buyer and seller signing, escrow agents prepare a "Final" HUD-1 wherein details of the actual fund disbursements are listed for the lender's records.

6. The "cash back" scheme puts the loan at greater risk as the loan originates with negative equity in the property. For that reason, lenders do not allow a buyer to receive cash at closing of the origination of a loan.

**Defendants**

7. DANIEL MORAR ("MORAR") was the sole owner of D. Contractor Invest, Inc, a Nevada corporation formed on November 13, 2006.

8. GHEORGHE BABETI ("BABETI"), employment unknown, was the listed buyer of 10 residential properties that are the subject of the scheme charged below.

9. COSMINA BUNEA ("BUNEA"), employment unknown, was the listed buyer of 11 residential properties that are the subject of the scheme charged below.

10. DOREL IRIMICIUC ("IRIMICIUC"), employment unknown, was the listed buyer of one residential property that is the subject of the scheme charged below.

11. SAMUEL DOBOS ("DOBOS"), employment unknown, was an associate of MORAR and is married to BABETI'S daughter, Georgiana Dobos.

12. BRANDON AZADEGAN ("AZADEGAN") was an employee of CI Custom Builders and an associate of MORAR.

13. CIPRIANO IONUTESCU ("IONUTESCU") was the owner of CI Custom Builders and an associate of BUNEA.

14. CHRISTINA MEJIA ("MEJIA") was employed as an escrow officer at Great American Title Agency in Phoenix, AZ.

15. CATHERINE ZEBARTH ("ZEBARTH") was the sole owner of Smart Mortgage LLC, a residential mortgage loan broker in Tempe, AZ.

**Title Agencies**

16. Capital Title Agency ("CTA") was the designated escrow company for the seven (7) properties sold through Swallows Realty. The escrow files for the seven properties include a "Purchase Contract Addendum" providing instructions to the escrow officer to pay MORAR thousands of dollars at close of escrow.

17. Great American Title Agency ("GAT") was the escrow agency utilized by DOBOS to complete the "cash back" scheme involving at least fourteen (14) real estate purchase transactions. Many of the escrow files for the subject properties included instructions from the sellers to GAT directing disbursements to MORAR or his company, D. Contractor Invest.

**COUNTS 1-6**

**Wire Fraud**

**[Title 18 U.S.C. § 1343]**

18. Paragraphs 1-17 of the Introductory Allegations are re-alleged and reincorporated as if fully set forth herein.

19. From on or about July 31, 2006, up to and including January 1, 2007, within the District of Arizona and elsewhere, defendants MORAR, BABETI, BUNEA, IRIMICIUC, DOBOS, AZADEGAN, IONUTESCU, ZEBARTH, MEJIA, and others known and unknown to the grand jury, knowingly and willfully devised and intended to devise a scheme and artifice to defraud lenders, as identified below, and to obtain money from lenders by means of false and fraudulent pretenses, representations, and promises and by intentional concealment and omission of material facts.

**The Scheme and Artifice to Defraud**

20. It was part of the scheme and artifice to defraud that defendants MORAR, BABETI, BUNEA, IRIMICIUC, DOBOS, AZADEGAN, IONUTESCU, ZEBARTH, MEJIA, and others,

devised a "cash back" scheme to purchase real properties with mortgage loan applications, with respect to each count, falsely representing the buyer's assets, income, mortgage debts, sources of intended down-payment and intent to occupy the property as a primary residence. Moreover, the parties concealed from the lending institutions, by intentionally withholding addenda reflecting payments to MORAR, or by omitting on the HUD-1 that at the close of each sale a portion of the loan was paid to MORAR.

**Execution of the Scheme by Wire Communications**

21. On or about the dates listed below, within the District of Arizona, and elsewhere, defendants MORAR, BABETI, BUNEA, IRIMICIUC, DOBOS, AZADEGAN, IONUTESCU, ZEBARTH, and MEJIA, for the purpose of executing the aforesaid scheme and artifice to defraud, and attempting to do so, knowingly transmitted and caused to be transmitted by means of wire communication in interstate commerce signals and sounds, that is, banking wire transfers, from the identified financial accounts below, in the identified amounts to the identified recipient in the District of Arizona, the monies being mortgage financing funds for the real property listed below:

| Count | Date | Wire Transmission |
|---|---|---|
| 1 | 07/31/06 | $630,367 From Washington Mutual Bank, F.A.in Stockton, CA to Wells Fargo Bank, N.A. in Phoenix, AZ, for financing of 6325 E Sweetwater Ave, Scottsdale, AZ |
| 2 | 08/28/06 | $506,504.66 from U.S. Bank, N.A. Portland, OR, to Wells Fargo Bank, N.A. in Phoenix, AZ, for financing of 18402 N 75th Ave, Glendale, AZ |
| 3 | 10/31/06 | $373,192 from JP Morgan Chase Bank of New York, NY, to M & I Bank in Phoenix, AZ, for financing of 6518 W Molly Lane, Phoenix, AZ |
| 4 | 11/01/06 | $423,711 from JP Morgan Chase Bank of New York, NY, to M & I Bank in Phoenix, AZ, for financing of 6202 W Gambit Trail, Phoenix, AZ |
| 5 | 11/02/06 | $686,940 from Deutsche Bank of New York, NY, to M & I Bank in Phoenix, AZ, for financing of 4933 W Fallen Leaf, Glendale, AZ |
| 6 | 11/20/06 | $309,922 from Bank Of New York of New York, NY, to M & I Bank in Phoenix, AZ, for financing of 27929 N 64th Lane, Phoenix, AZ |

All in violation of Title 18, United States Code, §§ 1343 and 2 (aiding and abetting); Pinkerton v. United States, 328 U.S. 640 (1946).

**COUNT 7**

**Conspiracy to Commit Wire Fraud**

**[Title 18 U.S.C. § 1349]**

22. Paragraphs 1-17 and 19-21 are re-alleged and reincorporated as if fully set forth herein.

23. From a time unknown to the grand jury but at least as early as July 1, 2006, through November 2, 2006, in the District of Arizona, defendants MORAR, BABETI, BUNEA, IRIMICIUC, DOBOS, AZADEGAN, IONUTESCU, ZEBARTH, MEJIA, and others known and unknown to the grand jury, conspired, confederated and agreed with each other to commit an offense against the United States of America, by engaging in an ongoing conspiracy to obtain real estate, overvalue those properties, and receive "cash back" from the sales by obtaining loans from financial institutions based upon false information, in violation of Title 18, U.S.C. 1343; Wire Fraud.

**The Purpose of the Conspiracy**

24. The purpose of the conspiracy was as follows:

a. To locate properties for sale with fair market values ranging from $375,000 to $900,000.

b. To use an appraisal that substantially inflated the fair market value of the property in order to obtain a higher loan amount based on the appraisal.

c. To use associates to purchase the properties, typically multiple properties for each buyer.

d. To enable buyers to qualify for loan amounts by falsifying wage verification to make incomes consistent with the amounts requested.

e. To find a title company to facilitate the "cash back" transactions by falsifying HUD-1 statements sent to the lender, and not disclosing the cash back amounts to the defendants.

f. To enable defendant MORAR to receive money for assisting with the acquisition and sale of the properties.

**Means and Methods of the Conspiracy**

25. It was part of the conspiracy that MORAR utilized defendants BABETI, BUNEA, and IRIMICIUC as "straw buyers" to apply for and purchase multiple properties for the purpose of obtaining "cash back" at closing from the lender. The scheme was completed in the following manner:

a. DOBOS assisted in locating at least twenty-three separate residential properties for BABETI, BUNEA, and IRIMICIUC to purchase. BABETI acted as the buyer of at least ten properties, BUNEA acted as the buyer of at least eleven properties, and IRIMICIUC acted as the buyer of at least two properties. These residences were represented to the lenders to be owner-occupied and not investment properties, each with a fair market value ranging from $375,000 to $900,000.

b. DOBOS utilized his former neighbor, Natasha Swallows ("Swallows"), a licensed realtor at Swallows Realty, to submit purchase contracts to five homeowners on behalf of BUNEA. No realtor was listed on the HUD-1 for the purchase of the other eighteen properties sold to BUNEA, BABETI, and IRIMICIUC. In most cases, the purchase prices offered by MORAR'S "straw buyers" exceeded the sellers' asking prices by between $69,000 and $180,000.

c. MORAR received "cash back" on the five properties sold through Swallows with separate addenda to the purchase contracts. The addenda reflect that offers were written on the same dates as the offers to purchase and specified the differences between the sellers' asking prices and buyers' offers would be paid directly to MORAR or his company, D. Contractor Invest.

d. A portion of the funds diverted to MORAR was then disbursed back to the "straw buyers." MORAR paid at least $108,500 to BUNEA. An additional $22,493 was paid to escrow agencies on BUNEA'S behalf to pay the closing costs associated with the purchase of several properties.

e. In order to buy multiple owner-occupied properties, BUNEA, BABETI, and IRIMICIUC sent loan applications for each property to different lenders at the same time. This was done so that no single lender was aware that any buyer was in the process of purchasing multiple homes. Additionally, DOBOS directed Swallows to omit the addenda when sending the purchase contracts to at least two loan officers.

f. Ten properties purchased by BABETI and six of eleven properties purchased by BUNEA were bought from other associates of MORAR. No realtor was listed on the loan documents for those transactions. Defendant IRIMICIUC purchased at least two properties in a similar manner with cash back of $65,300 also going to MORAR; Swallows was the seller of one of the residences. Following the closing of the two straw purchases, MORAR paid at least $37,500 of the funds he received back to IRIMICIUC.

g. AZADEGAN hired ZEBARTH to create residential mortgage loan applications containing false information, including rental history, occupancy status, employment and wages, and assets and liabilities. ZEBARTH did this for at least four of the properties purchased by BABETI and at least two of the properties purchased by BUNEA. ZEBARTH submitted the false applications through her company, Smart Mortgage LLC, to various lending institutions.

h. Defendants used two escrow agents and their assistants to complete the scheme. The lenders were unaware that funds were going back to a third party, namely MORAR, who was associated with the buyers. The escrow agents often manipulated the HUD-1s to conceal the fact that the buyer received funds from the transaction.

26. The following chart summarizes BUNEA'S and IRIMICIUC'S property transactions at CTA:

| Transaction # | Date of Sale | Address | Buyer | Loan Amount | "Cash Back" Amount |
|---|---|---|---|---|---|
| 1 | 11/01/06 | 6224 W Hedgehog Place Phoenix, AZ | Bunea, Cosmina | $460,000 | $85,000 |
| 2 | 11/01/06 | 6202 W Gambit Trail Phoenix, AZ | Bunea, Cosmina | $525,000 | $125,000 |

| 3 | 11/02/06 | 4933 W Fallen Leaf Glendale, AZ | Bunea, Cosmina | $900,000 | $180,000 |
|---|---|---|---|---|---|
| 4 | 11/07/06 | 6518 W Molly Lane Phoenix, AZ | Bunea, Cosmina | $375,000 | $69,000 |
| 5 | 11/13/06 | 6802 W Briles Rd Peoria, AZ | Irimiciuc, Dorel | $620,000 | $65,300 |
| 6 | 11/21/07 | 27929 N 64th Phoenix, AZ | Bunea, Cosmina | $390,000 | $90,000 |
| 7 | 11/27/07 | 27838 N 60th Lane Phoenix, AZ | Irimiciuc, Dorel | $590,000 | $81,200 |

27. MEJIA, an escrow agent at GAT, prepared and submitted at least four separate Pre-audit HUD-1s to various lenders that omitted the cash out disbursement to MORAR. After receiving funding from the lenders, MEJIA prepared the final HUD-1 revealing payments to MORAR and disbursed funds accordingly.

28. The following chart summarizes BUNEA'S and BABETI'S property transactions at GAT, where funds were diverted to MORAR:

| Trans action # | Date of Sale | Address | Buyer | Loan Amount | "Cash Back" Amount |
|---|---|---|---|---|---|
| 1 | 07/31/2006 | 16942 E Monterrey Dr Fountain Hills, AZ | Babeti, Gheorghe | $767,000 | $85,000 |
| 2 | 07/31/2006 | 32809 N 24th Dr Phoenix, AZ | Babeti, Gheorghe | $640,000 | $93,000 |
| 3 | 08/01/2006 | 6325 E Sweetwater Scottsdale, AZ | Babeti, Gheorghe | $775,000 | $55,086 |
| 4 | 08/01/2006 | 26155 N 68th Ave Peoria, AZ | Babeti, Gheorghe | $600,000 | $69,303 |
| 5 | 08/14/2006 | 5639 E Thunderbird Scottsdale, AZ | Babeti, Gheorghe | $674,000 | $55,574 |
| 6 | 08/16/2006 | 18402 N 75th Ave Glendale, AZ | Babeti, Gheorghe | $625,000 | $50,000 |
| 7 | 09/21/2006 | 14858 N El Sobrante Ave Fountain Hills, AZ | Babeti, Gheorghe | $605,150 | $61,000 |

| 8 | 10/12/2006 | 1001 E Northview Phoenix, AZ | Bunea, Cosmina | $410,000 | $70,000 |
|---|---|---|---|---|---|
| 9 | 10/31/2006 | 5549 E Pershing Scottsdale, AZ | Bunea, Cosmina | $700,000 | $100,000 |
| 10 | 11/01/2006 | 6809 W Cottontail Peoria, AZ | Bunea, Cosmina | $580,000 | $70,845 |
| 11 | 12/29/2006 | 606 W Los Corrales Dr Desert Hills, AZ | Bunea, Cosmina | $700,000 | $110,000 |

29. On transactions 4, 5, 6, and 11, MEJIA submitted Pre-audit HUD-1s to the lenders omitting the disbursements to MORAR. MEJIA accepted instructions from the sellers, including DOBOS, directing the disbursements to MORAR.

**Overt Acts**

30. In furtherance of the above-referenced conspiracy and to effect the objectives of the conspiracy, the defendants and other persons did perform and cause to be performed the following overt acts:

a. On June 19, 2006, BABETI signed a Uniform Residential Loan Application for the property located at 16942 E Monterey Dr, Fountain Hills, AZ containing the following false information: his intent to occupy the property as a primary residence, overstated gross monthly wages, and misrepresented assets and liabilities.

b. On July 27, 2006, BABETI signed a Uniform Residential Loan Application for the property located at 32809 N 24th Drive, Phoenix, AZ, containing the following false information: his intent to occupy the property as a primary residence, overstated gross monthly wages, and misrepresented assets and liabilities.

c. On August 9, 2006, BABETI signed a Uniform Residential Loan Application for the property located at 5639 E. Thunderbird, Scottsdale, AZ, containing the following false information: his intent to occupy the property as a primary residence, overstated gross monthly wages, and misrepresented assets and liabilities.

d. On August 24, 2006, DOBOS signed an addendum to the purchase contract for the purchase of 18402 N 75th Ave, Glendale, AZ instructing GAT to disburse $50,000 to MORAR.

e. On August 25, 2006, MEJIA prepared a Pre-audit HUD-1 for the purchase of 18402 N 75th Ave, Glendale, AZ. This document, submitted by MEJIA to SouthStar Funding, failed to disclose to the lender a $50,000 cash back payout to MORAR.

f. On or about October 10, 2006, at Swallows' direction, an employee of Swallows Realty, sent a facsimile cover page to CTA, stating, "I'm sure Tasha told you all different lenders and they can't know about the other homes."

g. On October 13, 2006, MORAR incorporated D Contractor Invest ("DCI") in Nevada, listing himself on corporate records as the president, secretary, treasurer, and director. On November 1, 2006, MORAR opened a business account for D Contractor Invest at Wells Fargo Bank. After November 1, 2006, DOBOS caused "cash back" money to be wired to the DCI bank account.

h. On October 21, 2006, IONUTESCU signed a Verification of Rent ("VOR") verifying BUNEA as a tenant for the residence at 8327 E Desert Cove, Scottsdale, AZ. This document, used for BUNEA's purchase of 6202 W. Gambit Trail in Phoenix, contained false information about the tenant, false rental dates, and false payment information.

i. On October 21, 2006, IONUTESCU signed a VOR verifying BUNEA as a tenant for 10626 N Miller Rd., Scottsdale, AZ. This document, used for BUNEA's purchase of 6202 W. Gambit Trail in Phoenix, contained false information about the tenant, false rental dates, and false payment information.

j. On October 24, 2006, BUNEA signed a Uniform Residential Loan Application for the property located at 6518 W Molly Lane, Phoenix, AZ, containing the following false information: employment and wage information, false verifications of rent, and misrepresented assets and liabilities.

k. On or about October 24, 2006, ZEBARTH prepared a Uniform Residential Loan Application for 6518 W Molly Lane, Phoenix, AZ, containing false information about the mortgagee's employment and earnings.

l. On October 30, 2006, BUNEA signed a Uniform Residential Loan Application for the purchase of 6202 W Gambit Trail, Phoenix, AZ, containing the following false information: false employment, falsely stating an intent to occupy the property as a primary residence, overstated gross monthly wages, false rental verifications and misrepresented assets and liabilities.

m. On October 30, 2006, Swallows, at DOBOS' direction, withheld an Addendum to the Residential Real Estate Purchase Contract to the lender for the property purchased by BUNEA, at 4933 W Fallen Leaf Lane, Glendale, AZ, which stated, "Seller to contribute $180,000 to Daniel Morar for remodeling."

n. On November 1, 2006, IONUTESCU signed a VOR listing BUNEA as a tenant for 8327 E Desert Cove, Scottsdale, AZ. This document, used for BUNEA's purchase of 4933 W Fallen Leaf Lane, Glendale, AZ, contained false tenant information, incorrect lease dates and false payment information.

o. On November 1, 2006, IONUTESCU signed a VOR verifying BUNEA as a tenant for 10626 N Miller Rd, Scottsdale, AZ, containing false tenant information, incorrect lease dates, and false payment information.

p. On November 1, 2006, BUNEA signed a Uniform Residential Loan Application for 4933 W. Fallen Leaf, Glendale, AZ, containing the following: false employment information, false statement of an intent to occupy the property as a primary residence, overstated gross monthly wages, false rental verifications and misrepresented assets and liabilities.

q. On November 17, 2006, BUNEA signed a Uniform Residential Loan Application for 27929 N 64th Lane, Phoenix, AZ, containing the following information: false employment information, false statement of an intent to occupy the property as a primary residence, overstated gross monthly wages, false rental verifications and misrepresented assets and liabilities.

r. On or about December 22, 2006, ZEBARTH prepared a Uniform Residential Loan Application for 606 W Los Corrales Drive, Desert Hills, AZ, containing false information about the mortgagee's employment and earnings.

All in violation of Title 18 U.S.C. §§ 1349 and 2 (aiding and abetting).

## COUNTS 8-17

### Transactional Money Laundering

### [Title 18 U.S.C. § 1957]

31. Paragraphs 1-17, 19-21 and 23-30 are re-alleged and reincorporated as if fully set forth herein.

32. On or about the dates set forth below, within the District of Arizona and elsewhere, defendants MORAR, BABETI, BUNEA, IRIMICIUC, DOBOS, AZADEGAN, IONUTESCU, ZEBARTH, and MEJIA, through the corporation D. Contractor Invest Inc and others known and unknown to the grand jury, did knowingly engage, and attempt to engage, in a monetary transaction by, through and to a financial institution, affecting interstate or foreign commerce, in criminally-derived property of a value greater than $10,000.00, that is, the negotiation of the checks identified below which were the direct result of cash out transactions of fraudulently inflated real estate purchases, in the amounts set forth below, from property having been derived from a specified unlawful activity, that is Wire Fraud in violation of Title 18, United States Code, section 1343:

| Count | Date | Monetary Transaction |
|---|---|---|
| 8 | 08/01/2006 | Negotiation of check number 040903 for $85,000.00 from the financing of 16942 E. Monterey DR. Fountain Hills, AZ 85268. Morar endorsed check. |
| 9 | 08/01/2006 | Negotiation of check number 040911 for $93,000.00 from the financing of 32809 N. 24th DR. Phoenix, AZ 85085. |
| 10 | 08/08/2006 | Negotiation of check number 041209 for $56,303.79 from the financing of 26155 N. 68th AVE, Peoria, AZ. |
| 11 | 08/24/2006 | Negotiation of check number 042188 for $55,086.77 from the |

| | | |
|---|---|---|
| | | financing of 6325 E. Sweetwater Ave, Scottsdale, AZ. Morar endorsed check. |
| 12 | 09/15/2006 | Negotiation of check number 043738 for $50,000.00 from the financing of 18402 N. 75th Ave, Glendale, AZ. |
| 13 | 09/26/2006 | Negotiation of check number 044478 for $61,000.00 from the financing of 14858 N. Sobrante Ave., Fountain Hills, AZ. |
| 14 | 11/02/2006 | Negotiation of check number 065865 for $125,000.00 from the financing of 6202 W Gambit Trail, Phoenix, AZ. Check deposited into Morar's account. |
| 15 | 11/02/2006 | Negotiation of check number 065923 for $180,000.00 from the financing of 4933 W. Fallen Leaf, Glendale, AZ. Check deposited into Morar's account. |
| 16 | 11/06/2006 | Negotiation of check number 066207 for $69,000.00 from the financing of 6518 W. Molly Lane, Phoenix, AZ. Check deposited into Morar's account. |
| 17 | 11/20/2006 | Negotiation of check number 067192 for $90,000.00 from the financing of 27929 N. 64th Lane, Phoenix, AZ. Check deposited into Morar's account. |

All in violation of Title 18, United States Code, §§ 1957 and 2 (aiding and abetting), and Pinkerton v. United States, 328 U.S. 640 (1946).

**COUNT 18**

**Conspiracy to Commit Money Laundering**

**[18 U.S.C. § 1956(h)]**

33. The factual allegations in paragraphs 1-17, 19-21, 23-30 and 32 of the Indictment are incorporated by reference and realleged as though fully set forth herein.

34. From on or about July 31, 2006 through on or about January 1, 2007, within the District of Arizona and elsewhere, defendants MORAR, BABETI, BUNEA, IRIMICIUC, DOBOS, AZADEGAN, IONUTESCU, ZEBARTH, and MEJIA, through the corporation D. Contractor Invest Inc and others known and unknown to the grand jury, did knowingly and willfully conspire and agree together, with each other and others, to commit the following offenses against the United States:

**Objects of the Conspiracy**

a. Promotional money laundering in violation of Title 18, United States Code, § 1956(a)(1)(A)(I).

b. Transactional money laundering in violation of Title 18, United States Code, § 1957.

**Manner and Means of the Conspiracy**

35. The manner and means employed by defendants MORAR, BABETI, BUNEA, IRIMICIUC, DOBOS, AZADEGAN, IONUTESCU, ZEBARTH, and MEJIA, through the corporation D. Contractor Invest Inc, and others, to effect the objects of the conspiracy, were as follows:

a. Knowing that the money and funds received from the sale of residential properties represented the proceeds of unlawful activities; specifically violations of 18 U.S.C. § 1343 (Wire Fraud), defendants routinely deposited it into bank accounts, or withdrew it from bank accounts of the various entities and individuals. Checks were written against those bank accounts and used to pay the expenses of carrying on the activities of the entities and individuals, such as payments for commissions, kickbacks, and purchases of additional properties.

b. After the money and funds were received from the criminally-derived activities (wire fraud), it was routinely deposited into bank accounts, or withdrawn from bank accounts of the various entities and individuals. Funds from these accounts were used to engage in monetary transactions in amounts greater than $10,000.00.

All in violation of Title 18 U.S.C. §§ 1956(h) and 2 (aiding and abetting).

**FORFEITURE ALLEGATION**

36. As a result of committing the conspiracy offense alleged in Count Seven (7), defendants MORAR, BABETI, BUNEA, IRIMICIUC, DOBOS, AZADEGAN, IONUTESCU, ZEBARTH, and MEJIA shall forfeit to the United States pursuant to 18 U.S.C. § 981(a)(1)(c) and 28 U.S.C. § 2461 any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. §1349.

37. As a result of committing one or more of the wire fraud offenses alleged in Counts One

(1) through Six (6) of this Indictment, defendants MORAR, BABETI, BUNEA, IRIMICIUC, DOBOS, AZADEGAN, IONUTESCU, ZEBARTH, and MEJIA shall forfeit to the United States pursuant to 18 U.S.C. § 982(a)(2), any property constituting, or derived from, proceeds the said defendants obtained directly or indirectly, as a result of the said violations.

38. As a result of committing one or more of the money laundering offenses alleged in Counts Eight (8) through Seventeen (17) of this Indictment, defendants MORAR, BABETI, BUNEA, IRIMICIUC, DOBOS, AZADEGAN, IONUTESCU, ZEBARTH, and MEJIA shall forfeit to the United States pursuant to: 1) 18 U.S.C. § 981(a)(1)(c) and 28 U.S.C. § 2461 any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1343, including, but not limited to, $1,900,000 in United States currency; and 2) 18 U.S.C. § 982(a)(1) any property, real or personal, involved in such offense, or any property traceable to such property.

39. Cash Proceeds: The government will seek a judgment for the sum of approximately $1,900,000 in U.S. Currency and all interest and proceeds traceable thereto, in that such sum in aggregate constitutes the proceeds derived from the criminal violations, for which the defendants who are convicted of one or more of said offenses shall be jointly and severally liable.

40. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

a. Cannot be located upon the exercise of due diligence;

b. Has been transferred or sold to, or deposited with, a third person;

c. Has been placed beyond the jurisdiction of the Court;

d. Has been substantially diminished in value;

e. Has been commingled with other property which cannot be subdivided without difficulty,

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p) to seek forfeiture of any other property of said defendants up to the value of the above forfeitable property, including but not limited to all property, both real and personal, owned by the defendants.

All in violation of Title 18, United States Code, §§ 981(a)(1)(c), 982(a)(1) and (a)(2) and 1343, and Title 28, United States Code, § 2461.

A TRUE BILL

/s/
FOREPERSON OF THE GRAND JURY
Date: June 17, 2008

DIANE J. HUMETEWA
United States Attorney
District of Arizona

/s/
KEVIN M. RAPP
Assistant U.S. Attorney