**CROWE & SCOTT, P.A.**
1100 E. Washington St.
Suite 200
Phoenix, Arizona 85034-1090
Telephone (602)252-2570
Facsimile (602) 252-1939
Email: tom@crowescott.com

Tom Crowe (#002180)
Attorneys for Defendant
Cipriano Ionutescu

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, ) | No. CR08-0612-007-PHX-NVW |
| Plaintiff, ) | **DEFENDANT IONUTESCU'S REPLY IN SUPPORT OF MOTION FOR NEW TRIAL PURSUANT TO RULE 33** |
| v. ) | |
| Cipriano Ionutescu (007), et al., ) | [Oral Argument Requested] |
| Defendants. ) | |

Defendant, Cipriano Ionutescu, by and through counsel undersigned, submits this reply in support of his motion for this Court to grant a new trial herein in the interest of justice pursuant to *Fed. R. Crim. P.* 33. This reply is supported by the accompanying memorandum of points and authorities, the record of proceedings, including the matters previously filed herein, together with any matters presented at the hearing on this motion.

DATED this 9th day of December, 2009.

CROWE & SCOTT, P.A.


By  s/ Tom Crowe
Tom Crowe
1100 East Washington, Suite 200
Phoenix, Arizona 85034-1090
Attorneys for Defendant Ionutescu

**MEMORANDUM OF POINTS AND AUTHORITIES**

**1. Background and Applicable Law.**

While there should be no dispute either as to the background and bases for this motion or the applicable law, it is submitted that the government confused the legal issue presented in its response and, in its conclusion, misstated the law.

Defendant relied upon *United States v. Alston,* 974 F.2d 1206, 1211-1212 (9th Cir. 1992), *United States v. Kellington*, 217 F.3d 1084, 1086 (9th Cir. 2000), and *United States v. Evans,* 121 Fed. Appx. 695, 695-696, 2005 WL 147586, 1 (9th Cir. 2005) in support of his motion. The government does not dispute the applicability of those authorities to the issues here presented.

In opposition to the relief sought (Doc. # 503), the government relies upon *United States v. Pimentel,* 654 F.2d 538, 545 (9th Cir. 1981), *Alston*, and *United States v. Powell*, 469 U.S. 57 (1984). *Pimental* cites language in the 1969 edition of *Federal Practice and Procedure* regarding "exceptional circumstances," but the 1981 opinion should be put in the context of the facts there presented.

> A motion for a new trial is directed to the discretion of the district judge. It should be granted "only in exceptional cases in which the evidence preponderates heavily against the verdict." 2 Wright, Federal Practice and Procedure, Criminal s 553 at 487 (1969). Far from finding that the evidence preponderated heavily against the verdict, the district judge commented that, viewing the evidence in the light most favorable to the government after the verdict, the case on the issue of criminal intent as to both defendants was "devastating." In reviewing the record, we cannot say that the district judge abused his discretion in failing to grant a new trial. There is adequate evidence to show that Pimentel knew that he was engaging in illegal wiretapping.

*Pimentel* at 545. *Pimentel's* reasoning can be read to confuse the separate standards applicable to motions for judgment of acquittal and motions for new trial. Indeed, in considering the defendant's motion for new trial, the court referenced the standard applicable to Rule 29 motions for judgment of acquittal (viewing the evidence in the light most favorable to the government) as opposed to the distinctly different standard applicable to Rule 33 motions for a new trial.

2

Other decisions of the Ninth Circuit clearly make this distinction. *Alston* specifically holds that the district court need *not* view the evidence in the light most favorable to the verdict, that the court may independently weigh the evidence for itself, and that the court may grant a new trial even if it considered the evidence sufficient to sustain the verdict.

> A district court's power to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal. See 3 Charles Alan Wright, *Federal Practice and Procedure* § 553 at 245 (1982). "The district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses." *United States v. Lincoln,* 630 F.2d 1313, 1319 (8th Cir.1980); accord *United States v. Indelicato,* 611 F.2d 376, 387 (1st Cir.1979). "If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury." *Lincoln,* 630 F.2d at 1319.

*Alston* at 1211-1212. Moreover, *Alston* made it clear that "a court of appeals will only rarely reverse a district court's grant of a defendant's motion for new trial, and then only in egregious cases." *Id.*

The government's reliance on *United States v. Powell,* 469 U.S. 57 (1984) is misplaced. In *Powell,* the defendant sought relief for insufficiency of the evidence based upon inconsistent verdicts. Specifically, the defendant was acquitted of conspiracy to possess cocaine and possession of cocaine but convicted of using the telephone to commit those offenses. The Supreme Court relied on long standing precedent–*Dunn v. United States,* 284 U.S. 390 (1932)–in declining to set aside the convictions based on inconsistent verdicts. There was no Rule 33 motion at issue in *Powell* and it does not speak to this motion.

In its conclusion, the government states that Defendant's motion for new trial should be denied "because the jury could have rationally reached a verdict of guilty." (Response at 6.) As the Ninth Circuit and other courts have made abundantly clear, this is not a valid consideration in determining whether a district should grant a new trial.

**2. Bases for Defendant's Motion for New Trial.**

Defendant's motion for new trial (Doc. # 487) specifically incorporated by reference

3

his arguments in support of his Rule 29 motion (Doc. # 486) without fully setting forth those same arguments in the Rule 33 motion. In terms of witnesses, the Rule 29 motion addressed in some detail (a) the testimony of the 4 government witnesses–out of 20–who referenced Mr. Ionutescu in their testimony (including primarily Ms. Zebarth and Mr. Azadegan), (b) the 3 exhibits consisting of some 10 pages–out of some 8,812 total pages of exhibits–that referenced Mr. Ionutescu, (c) the audio-video recording, and (d) the absence of evidence.

In its response, the government responded only to the two issues separately set forth in Defendant's Rule 33 motion. Accordingly, this reply is confined to those issues.

**A. Testimony of Catherine Zebarth.** The government references three aspects of Ms. Zebarth's testimony which it deems persuasive. First, the government states that, "Zebarth testified that she became aware that defendant was engaged in an assignment of funds from discussions with both Azadegan and defendant. (RT 10/7/08 [sic] 28-29.)" (Response at 3.) In fact, Zebarth testified that with respect to third party disbursements, she saw the name of Mr. Ionutescu's company, CBI, on a final HUD statement and that CBI remodeled or upgraded homes to be sold for a profit. She did not know whether Mr. Ionutescu or his company received any improper disbursements or, for that matter, any specific disbursement.

The second item of testimony on which the government relies is that "Zebarth had a discussion with defendant where he advised her that the loans (for Babeti and Bunea) were starting to foreclose (RT 10/7/09 67.)" (*Id.* at 4.) Zebarth's testimony was that during a casual conversation with Mr. Ionutescu, "I believe he mentioned that these loans were starting to foreclose. I believe it was Babeti. He mentioned that they were starting to foreclose. I think he looked them up and mentioned it to me." There is no basis on which to conclude that looking up the status of properties, if it occurred, and providing that information to Zebarth was in any way inculpatory.

The third item of testimony which the government cites is that Zebarth had "discussions with defendant about the use of straw buyers." (*Id.*) In addition, that Mr.

4

1  Ionutescu told Zebarth "that he was no longer going to make the payments for Lazar and
2  Zarba . . . ." (*Id.*)  First, there is no evidence in the record that Mr. Ionutescu had any
3  discussions with Zebarth "about the use of straw buyers," or, for that matter, that the subject
4  of straw buyers was ever even mentioned.  Second, there was no evidence identifying Lazar
5  or Zarba, much less linking either of them to the matters alleged in the indictment. Zebarth's
6  testimony was confined to the statement that "He [Mr. Ionutescu] said he wasn't going to
7  make his payments for him."

8  The government asserts that, "Zebarth had direct and prolonged involvement with
9  defendant in numerous real estate deals, including third party assignments and the use of
10 straw buyers." (*Id.* at 5.) This statement is unsupported by any evidence in the record. The
11 government does not reference any exhibit, any transaction, any straw buyer or even any
12 testimony which supports the foregoing conclusion.

13 The government omits reference to the following facts which are either undisputed
14 or on which there is no evidence.  The only business dealings which Mr. Ionutescu had with
15 Zebarth, according to her own testimony,  were two construction loans and one refinance on
16 Mr. Ionutescu's personal residence. There is no evidence that Mr. Ionutescu was party to any
17 real estate transaction in which Zebarth was involved, either as a buyer or seller.  There is
18 no exhibit in the record which shows that Mr. Ionutescu or his company was a party to any
19 third party assignment.  Assuming that any such disbursement occurred, there is no evidence
20 that it was for any purpose other than to pay CBI for construction work.  There is no
21 evidence that Messrs. Lazar or Sarba–whoever they are–had any connection to any of the
22 matters alleged in the indictment, that Zebarth handled any transaction involving them, that
23 they ever owned or had an interest in any properties, that they were straw buyers of
24 properties, or that any business arrangement they may have had with Mr. Ionutescu–on which
25 no evidence was offered–was other than legitimate.

26 **B. Testimony of Brandon Azadegan.** The government summarizes the testimony
27 offered by Mr. Azadegan to the effect that "they" (Messrs. Azadegan and Ionutescu) became

28

5

involved in the business of buying and selling homes, that Mr. Ionutescu shared in the proceeds of those homes, that Mr. Ionutescu kept an accounting of the monies advanced to or owed by Azadegan, and that Mr. Ionutescu introduced Azadegan to Dobos. ( *Id.* at 4.) That much–put in proper context–is true. The context is that according to Azadegan, with the exception of one unidentified property in which Mr. Azadegan, Mr. Ionutescu and a Mr. Leslie Williams apparently invested in 2005, Mr. Ionutescu was paid only for the construction and remodeling work he did on properties. There is no evidence that Mr. Ionutescu bought or sold any homes in conjunction with Mr. Azadegan during the time period alleged in the indictment. Indeed, as noted in Defendant's Rule 29 motion, none of those properties are even alleged in the indictment. More specifically, and despite every motivation to do so, Mr. Azadegan did *not* testify to the effect that Mr. Ionutescu was party to any agreement or understanding in the nature of the scheme alleged in the indictment; namely, that he was connected in any respect with recruiting straw buyers or agreed to do so, that he was involved with submitting false loan applications or agreed to do so, or that he otherwise knew about and agreed to engage in any criminal acts whatsoever.

The government makes much of the fact that Mr. Ionutescu knew Mr. Dobos and introduced him to Azadegan. That fact is true. However, as the court stated in its instructions, "It is not enough . . . that they [conspirators] simply met, discussed matters of common interest, acted in similar ways, or perhaps helped one another. You must all find that there was the same plan to commit at least one of the crimes alleged in the Superseding Indictment as an object of the conspiracy with all of you agreeing as to the particular crime which the conspirators agreed to commit." "Similarly, . . . a person does not become a conspirator merely by associating with one or more persons who are conspirators, nor merely by knowing that a conspiracy exists." (Final Jury Instructions at 12.)

**C. Verifications of Rent.** Defendant extensively addressed the issues pertaining to Exhibits 126-162 and 126-163 in his Rule 29 motion at 11-12, 16-18. The government does not respond to those issues in its response. Instead, the government includes a portion of the

testimony of Azadegan where Azadegan answers, "No," in response to the question as to whether Mr. Ionutescu was providing false verifications. (Response at 5.) The complete exchange, contained in Defendant's Rule 29 motion at 11-12, makes it clear that Azadegan had no knowledge whatsoever as to whether Mr. Ionutescu had submitted any false rent verifications. In fact, the testimony of Azadegan regarding the absence of Defendant's handwriting on critical portions of the verifications tends to undermine rather than substantiate their probative value.

**D. Audio-Video Recording.** The playing of the excerpts of the audio-video recording before the jury is one of the core reasons why Defendant submits that the granting of a new trial is not only appropriate but necessary to serve the interest of justice in this case. Defendant addressed the issues pertaining to the admissibility of the selected excerpts of the audio-video recording in his Rule 29 motion at 13-14, 18-21 and prior motions (*i.e.*, Doc #402 and #419). Again, the government does not respond to those several issues in its response. The totality of the government's response to Defendant's numerous contentions regarding the recording is as follows:

> With respect to the audio-video excerpts of an undercover meeting between defendant and Agent Amjad Qaqish defendant argues that the video recordings should not have been admitted. The tapes were relevant as they corroborated defendant's relationship with Azadegan, his sophistication in the real estate market, and his knowledge of "cash back."

(Response at 6.) The government does not offer any justification for the admission of the statements of the real estate sales person (O'Carroll). The government does not refute Defendant's assertion that neither *Fed. R. Evid.* 801(d)(2)(E) nor any other provisions of Rule 801(d)(2) support the admission of her statements. The government does not respond to Defendant's argument that O'Carroll's statements were subject to the Confrontation Clause and were testimonial within the meaning of *Crawford v. Washington*, 541 U.S. 36 (2004). The government does not argue that Defendant's statements were an admission under *Fed. R. Evid.* 801.

The government contends only that the excerpts were "relevant as they corroborated

defendant's relationship with Azadegan, his sophistication in the real estate market, and his knowledge of 'cash back.' " (*Id.*)

First, the excerpts did not "corroborate defendant's relationship with Azadegan." There is only one reference to Azadegan in the excerpts and it is as follows:

> O'Carroll: How do we - - how did Brandon do it on Aster?
>
> Ionutescu: Well - - and that's something - - pretty much - - I'm just trying to figure out if I could carry. . . .

It is not in dispute that Messrs. Azadegan and Ionutescu knew one another and had business dealings on certain properties in 2005 which are not the subject of the indictment. But the foregoing non-responsive exchange does not corroborate anything.

Second, Mr. Ionutescu's "sophistication in the real estate market," is not probative of or even relevant to the allegations here presented. Third, whether or not Mr. Ionutescu had knowledge of "cash back"–transactions in which he denied that he participated both to Agent Smith and otherwise, and of which there is no evidence–is irrelevant inasmuch as "cash back" or "third party disbursements," in and of themselves, are not illegal.

The reality is that there is nothing contained in the excerpts from the February 28, 2008 meeting that is probative of the allegations contained in the indictment.

Finally, the government does not address the interplay between *Fed. R. Evid.* 401–assuming *arguendo* that the excerpts were relevant–and Rule 403. The playing of these selected excerpts to the jury contained material–including statements of O'Carroll, Mr. Ionutescu and the undercover agent–which was not probative but highly prejudicial and which should not have been admitted in evidence. Defendant will not restate his arguments addressed to that issue in further detail here.

**E. Brady Material.** Defendant does not contend that there is a basis in the record on which a violation of *Brady v. Maryland,* 373 U.S. 83 (1963) and its progeny can properly be asserted, at least at this time. Defendant submits that the government's late disclosure of certain materials was tantamount to non-disclosure and, as such, provides a separate,

independent basis on which a new trial should be granted.

Defendant preserved this issue in his several pretrial motions. (*See* Doc. # 233, 303 and 368.) Briefly, the government provided the Defendant with some 150 hours of recorded telephone conversations between Azadegan and third persons which it identified as material which could be subject to disclosure under either 18 U.S.C. § 3500 or *Brady*. Inasmuch as this massive amount of information–together with other materials–was disclosed by the government on the eve of trial, counsel did not have an opportunity to review them prior to trial and, indeed, has not had the opportunity to review them post-trial.[1] In his motion for relief in the form of a continuance–which the court was understandably reluctant to grant on the eve of trial–Defendant noted that the government deemed the testimony of Mr. Azadegan to be critical to its case and that it would be highly unusual not to find at least some material in the recordings that would facilitate the cross-examination of Azadegan. The government's response to this issue is as follows:

> This argument is erroneous because the government disclosed recordings of Azadegan consistent with its obligations under the Jenck's [sic] Act in a timely fashion. (*See* Jencks Act, 8 U.S.C. § 3500, allows disclosure to be delayed until after the witness has been called by the government.) Moreover, the government reviewed the tapes for exculpatory information and none was found.[2]

(Response at 5-6.)

If Defendant's contention were simply that an alleged *Brady* violation occurred, the government's response that the Defendant's argument is "speculative" would be correct. But Defendant's argument is that the government may not, in the interest of trial fairness, disclose massive amounts of information on the eve of trial, either as Jencks Act or potential *Brady* material. While these are two separate issues, even the Jencks Act contemplates, by

---

[1] Counsel was appointed under the terms of the Criminal Justice Act and is reluctant to invest the resources required to inventory the recordings while other relief is pending. It may be appropriate to have the materials preserved as part of the record herein depending upon the outcome of these proceedings.

[2] It is not the prerogative of the government–much less that of its investigative agents as opposed to its attorneys–to make the determination regarding the potential usefulness of discoverable evidence.

adjournment of the trial or otherwise, that a defendant will have a fair opportunity to review the statements of a government witness prior to cross-examination.

Defendant previously cited *United States v. Gill*, 297 F.3d 93, 106 (2nd Cir. 2002), where the court reversed judgment on the basis of late disclosure warning the government that, "disclosure of critical information on the eve of trial is unsafe for the prosecution." In *United States v. Garner,* 507 F.3d 399, 408 (6th Cir. 2007), the court held that, ". . . even if the late disclosure of the cell phone records does not amount to a *Brady* violation, the denial of the request for a continuance to enable Garner's counsel to conduct the necessary investigation into the records was an abuse of discretion warranting a new trial."

Here, it is submitted that on the eve of trial the government provided the Defendant with the proverbial haystack–in fact, multiple very large haystacks–in which counsel was to find the needle. In *Gantt v. Roe,* 389 F.3d 908, 913 (9th Cir. 2004), the court stated as follows:

> As the Supreme Court reiterated just last term, "[a] rule ... declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process. *Banks v. Dretke,* 540 U.S. 668, 124 S.Ct. 1256, 1275, 157 L.Ed.2d 1166 (2004).

Defendant does not argue that this singular factor, standing alone, necessarily merits the granting of a new trial but, taken together, submits that a new trial is clearly warranted under the circumstances before this Court.

**3. Conclusion.**

It is submitted that the government has not satisfactorily addressed the several bases on which a new trial is sought. This was an unusual trial. The government's allegations regarding the nature of the scheme, as set forth in the indictment and reiterated in the government's opening statement, did not materialize at trial with respect to Mr. Ionutescu.

The vast majority of the evidence presented at trial related to defendants other than Mr. Ionutescu. The fact remains that whether by virtue of "prejudicial spillover ," the introduction of the audio-video tape excerpts, or otherwise, verdicts of guilty remain

outstanding as to Counts 1, 5 and 7. There are a constellation of factors which support the granting of a new trial with respect to Mr. Ionutescu. In summary, he requests this Court to exercise its discretion and grant his motion in order to serve the interest of justice.

DATED this 9th day of December, 2009.

CROWE & SCOTT, P.A.

By   s/ Tom Crowe

Tom Crowe
1100 East Washington, Suite 200
Phoenix, Arizona 85034-1090
Attorneys for Defendant Ionutescu

I hereby certify that on December 9, 2009 I electronically transmitted the attached document to the Clerk's Office using the ECF system for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants in this case:

**Anne M. Williams** anne@amwilliamslaw.net
*Attorney for Defendant Georgiana Dobos (010)*

**Brandon Nelson Cotto** azattorneybc@yahoo.com
*Attorney for Defendant Christina Mejia (009)*

**Baltazar Iniguez** zariniguez@aol.com
*Attorney for Defendant Natasha Swallows-Feagins (011)*

**Cameron A Morgan** camerona.morgan@hotmail.com
*Attorney for Defendant Dorel Irimiciuc (004)*

**James Richard Knapp** james.knapp2@usdoj.gov, suzanne.guerin@usdoj.gov
*Attorney for Plaintiff*

**Kevin M Rapp** Kevin.Rapp@usdoj.gov, kimberly.chamberlain@usdoj.gov, victoria.tiffany@usdoj.gov
*Attorney for Plaintiff*

**Kurt M Altman** attorneykaltman@yahoo.com
*Attorney for Defendant Gheorghe Babeti (002)*

**Patricia Ann Gitre** PATGITRE@PATRICIAGITRE.COM, missywoodburn@patriciagitre.com
*Attorney for Defendant Samuel Dobos (005)*

**Patrick E McGillicuddy** pmcgillicuddy@qwest.net
*Attorney for Defendant Brandon Azadegan (006)*

**Robert J Kavanagh** robertkavanagh@azbar.org
*Attorney for Defendant Samuel Dobos (005)*

**Thomas Martin Connelly** Tconnelly2425@aol.com, claimant@aol.com, dfirestone2425@aol.com
*Attorney for Defendant Catherine Zebarth (008)*

**Tom Crowe** tom@crowescott.com, cindy@crowescott.com, lisa@crowescott.com
*Attorney for Defendant Cipriano Ionutescu (007)*

**Thomas E Haney** haneyt@aol.com
*Attorney for Valeriu Manolescu*

By   s/ Cindy Malyuk