**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| United States of America, | ) | CR 08-0612-PHX-NVW |
| Plaintiff, | ) | **ORDER** |
| vs. | ) | |
| Cipriano Ionutescu, | ) | |
| Defendant. | ) | |

Pending before the Court are Defendant Ionutescu's Motion to Exclude Evidence (doc. #419), Motion for Judgment of Acquittal pursuant to Fed. R. Crim. P. 29(c)(1) (doc. #486), and Motion to Grant a New Trial pursuant to Fed. R. Crim. P. 33 (doc. #487) as to Counts 1, 5, and 7, as charged in the Superseding Indictment (doc. #259).

**I.     Fed. R. Crim. P. 29 Standard**

In ruling on a motion challenging the sufficiency of the government's evidence under Fed. R. Crim. P. 29, "[t]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Alarcon-Simi*, 300 F.3d 1172, 1176 (9th Cir. 2002).

**II.    Fed. R. Crim. P. 33 Standard**

"A district court's power to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal." *United States v. Alston*, 974 F.2d 1206,

1211 (9th Cir. 1992). The district court may weigh the evidence and evaluate for itself the credibility of the witnesses. *Id.* "If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury." *Id.* (quoting *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)).

**III. The Indictment**

The indictment charges Ionutescu and others with conspiring from July 1, 2006, through January 1, 2007, to commit the crime of wire fraud in violation of 18 U.S.C. § 1343. According to the indictment, the object of the conspiracy was to locate properties for sale; to use associates to purchase the properties–typically multiple properties for each buyer; to enable buyers to qualify for loan amounts by falsifying wage verifications to make incomes consistent with the amounts requested; to find a title company to facilitate "cash back" transactions by falsifying HUD-1 statements[1] sent to the lender and not disclosing the cash back amounts; and to enable Morar to receive money for assisting with the acquisition and sale of the properties. In particular, Morar, S. Dobos, and G. Dobos utilized Babeti, Bunea, Irimiciuc, and others as "straw buyers"[2] to apply for and purchase houses, representing that these would be used as residences. Babeti acted as the buyer of at least nine properties, Bunea acted as the buyer of at least eleven properties, and Irimiciuc acted as the buyer of at

---

[1] According to the indictment, a Pre-audit HUD-1 form lists fees and payments to be made in connection with the proposed loan and are reviewed by the lender. If the lender approves the Pre-audit HUD-1, funds are wired to the title or escrow company to disburse accordingly. The lender instructions specify that the escrow agent must notify the lender of any material changes to the HUD-1 and receive the lender's final approval prior to fund disbursement. After receiving the loan documents and funds from the lender and facilitating the buyer and seller signing, escrow agents prepare a Final HUD-1 wherein the details of the actual fund disbursements are listed for the lender's records.

[2] The indictment defines a "straw buyer" as someone recruited by an investor to take out a mortgage and purchase a house in that person's name. However, the "straw buyer" would not live in the house nor be responsible for the mortgage payments.

least two properties. Azadegan, another participant in the scheme, referred straw buyers to Zebarth, a mortgage loan broker, to create residential mortgage loan applications containing false information. Escrow agents were recruited to manipulate HUD-1 forms to conceal the fact Morar was receiving a portion of the funds from the sales. Ionutescu's role in the conspiracy was allegedly to refer straw buyers to Zebarth and to sign false verification of rent forms.

## IV. Evidentiary Rulings

Several exhibits were admitted subject to the government's ability to connect them to the charges against Ionutescu; however, their probative value was ultimately non-existent or minimal, and in any event offset by their prejudicial effect. These exhibits should therefore have been excluded.

### A. Personal Loans: Exhibit 182

This exhibit consisted of documents that were seized from Ionutescu's residence. Most of the documents contained no references to any of the transactions alleged in the indictment, and all of the documents pertained to transactions that took place in 2005, whereas the conspiracy was carried out in 2006 and 2007. The only documents that referred to transactions in the indictment were (1) an invoice from Appraisals Unlimited dated August 25, 2005, for $2,400 that refers to 16942 E. Monterey Drive, which was dismissed from the indictment; and (2) an invoice dated May 28, 2005, listing $400 for pool repairs on 6325 E. Sweetwater. These documents, however, do not connect Ionutescu to the charges alleged in the indictment. The fact that CBI Custom Builders, Ionutescu's company, performed repair work prior to the alleged conspiracy on one or more of the properties in the indictment does not link Ionutescu to any of the fraudulent transactions alleged.

Any marginal relevance these documents may have is substantially outweighed by the danger of unfair prejudice. Some of the documents refer to Azadegan, who plead guilty for his participation in the conspiracy and testified at trial. The jury could have concluded from the transactions that list Azadegan that because Ionutescu was in business with Azadegan in 2005, Ionutescu was also necessarily involved with Azadegan in the conspiracy. Further,

some of the documents referred to Ionutescu's purchase of various luxury items. These purchases were completely unrelated to any of the charges in the indictment and tend to place Ionutescu in an unfavorable light. As a result, exhibit 182 should have been excluded under Fed. R. Evid. 403.

### B. Video Recording

The jury also heard a video recording made by an undercover agent on February 28, 2008, of Ionutescu, the agent, and Janis O'Carrol (who is not an alleged co-conspirator) discussing a cash back scheme. Ionutescu, O'Carrol, and the undercover agent talked about how to structure the sale of Ionutescu's house with the agent acting as the buyer and also getting cash back from the purchase.

While much of the discussion in the video was vague, and many of the statements that most blatantly suggested illegal conduct were made by O'Carrol, Ionutescu did make some statements that intimated wrongdoing. For example, at one point Ionutescu suggested inflating the costs of repairs to allow the agent to keep some of the funds allocated to the remodeling of the property. He also suggested that the agent could get cash back from the sale of the property by structuring a separate transaction in which CBI Custom Builders would invest in the agent's company and later forgive a portion of the debt. The discussion also showed that Ionutescu understood how cash back transactions could be structured. However, the indictment did not cover the kind of conduct discussed by Ionutescu. Further, cash back transactions are not necessarily illegal. When O'Carrol suggested that cash back to the agent should not be disclosed to the bank–the kind of unlawful conduct that was alleged in the indictment–Ionutescu's response was that the cash back had to be disclosed because it would be illegal not to do so. Even if the video is marginally probative of Ionutescu's knowledge of how cash back transactions are structured, ultimately it proved to be exculpatory with respect to the conduct alleged in the indictment.

The video should have been excluded because its probative value is substantially outweighed by the potential prejudice to Ionutescu. The jury may very well have inferred that because Ionutescu was transacting business with O'Carrol, who in the video appeared

to be encouraging Ionutescu and the agent to engage in illegal conduct, Ionutescu must also have engaged in the wrongdoing alleged in the indictment. Ionutescu's own vague, seemingly nefarious statements concerning unrelated wrongdoing also could have prejudiced him because it may have led to jury confusion and bias. In light of the fact that the video was ultimately exculpatory and that the danger of unfair prejudice was great, the video should have been excluded under Fed. R. Evid. 403.

## V. Count 7: Conspiracy to Commit Wire Fraud

Count 7 charges Ionutescu and others with Conspiracy to Commit Wire Fraud in violation of 18 U.S.C. § 1349. Ionutescu does not challenge that a conspiracy between the other defendants existed. He contends instead that there was insufficient evidence to prove beyond a reasonable doubt that he was involved in the conspiracy. To link Ionutescu to the conspiracy, the government relies upon (1) testimony by Azadegan, Ionutescu's business partner; (2) testimony by Zebarth; (3) the video recording of Ionutescu and the agent discussing a cash back scheme; (4) and a false rent verification form signed by Ionutescu.

### A. Elements of a Conspiracy

"To prove a conspiracy, the government must show '(1) an agreement to engage in criminal activity, (2) one or more overt acts taken to implement the agreement, and (3) the requisite intent to commit the substantive crime.'" *United States v. McCaleb*, 552 F.3d 1053, 1058 (9th Cir. 2009) (quoting *United States v. Sullivan*, 552 F.3d 967, 976 (9th Cir. 2008)).

An overall agreement must have existed between the conspirators. *United States v. Bibbero*, 749 F.2d 581, 587 (9th Cir. 1984). The agreement may be inferred from the acts of the defendants pursuant to the scheme, or by circumstantial evidence that the defendants acted together with a common goal. *United States v. Disla,* 805 F.2d 1340, 1348 (9th Cir. 1986).

At least one overt act must have been committed in furtherance of the conspiracy. *United States v. Nelson*, 66 F.3d 1036, 1044 (9th Cir. 1995). The defendant need not commit the overt act as long as one of the co-conspirators does. *Id*. The act need not itself be

criminal, but must corroborate the criminal intent of the conspiracy. *United States v. Everett*, 692 F.2d 596, 599 (9th Cir. 1982).

Finally, the person charged as a co-conspirator must have had knowledge of the conspiracy and have acted in furtherance of it. *United States v. Wiseman*, 25 F.3d 862, 865 (9th Cir. 1994). "Mere casual association with conspiring people is not enough." *Id.* (quoting *United States v. Bautista-Avila*, 6 F.3d 1360, 1362 (9th Cir. 1993)). Instead, the defendant must have known of the purpose of the conspiracy, and must have known or had reason to know that others were involved, and that the defendant's own benefit from his dealings with them was probably dependent on the success of the entire venture. *United States v. Thomas*, 586 F.2d 123, 132 (9th Cir. 1978).

**B.     Analysis**

**1.     Azadegan's Testimony**

Azadegan, who plead guilty to various charges in connection with the conspiracy, testified for the government about his real estate business dealings with Ionutescu. Azadegan met Ionutescu in 2004. At the time, both were buying distressed properties, fixing them, and selling them. A few months after their first meeting, Azadegan and Ionutescu started doing business together. Ionutescu would find houses in need of repairs and would remodel them through his company CBI Custom Builders. Azadegan testified that most of the properties were in his or in his mother's name, but that Ionutescu shared in the proceeds of some of the sales.

Sometime in late 2005 or early 2006, Azadegan was having difficulty selling the properties. He was paying the mortgages and the upkeep for ten or eleven houses at a cost of about $35,000 per month. Ionutescu then introduced Azadegan to the Dobos's. Ionutescu told Azadegan that he knew certain investors that were converting houses into assisted living homes, and that Azadegan should give G. Dobos a call. Azadegan met the Dobos's and ultimately sold some of his properties at a profit to G. Dobos's father, Babeti. All of the transactions involving Babeti resulted in undisclosed cash back to Morar, who was introduced to Azadegan as the Dobos's builder.

Although not entirely clear from his testimony, Azadegan may have in fact believed that the properties would be converted into assisted living homes. Azadegan testified that, before the properties were sold, Ionutescu began remodeling the houses to add features to enable them to be used as assisted living homes. Azadegan also explained that he visited the properties a few months after selling them to Babeti and noticed that there was no work being done on them.

The other testimony that purports to link Ionutescu to illegal conduct concerns third party assignments and rent verifications. Azadegan testified that he did third party assignments[3] involving Ionutescu, and that the assignments were not reflected in purchase contracts. According to Azadegan, the money was then used to remodel and pay off the mortgages of other properties. The government also asked Azadegan whether he had ever provided false rent verifications, to which Azadegan responded in the affirmative. The government then asked whether Ionutescu "was doing that as well." Azadegan responded, "No. He had done some on several occasions. That is correct." But when asked whether he had seen Ionutescu sign off on false rent verifications, Azadegan admitted that he had not.

### 2. Zebarth's Testimony

Zebarth, who also plead guilty to various charges in connection with the conspiracy, testified for the government as well. Zebarth was the sole owner of Smart Mortgage LLC, a residential mortgage loan broker in Tempe, Arizona. She handled a number of the illegal transactions alleged in the indictment. She processed two loans in which Bunea was the purchaser, and she handled a number of transactions in which Azadegan, or Azadegan's mother, were the sellers, and Babeti, who was referred to Zebarth by G. Dobos, was the buyer. The loan applications in these transactions contained false information regarding the buyers' employment, salary, and intent to use the houses as primary residences. These

---

[3]A third party assignment is an instruction to pay money from escrow to a non-party to the transaction. It can be used to disburse part or all of the cash back.

1  transactions also resulted in cash back to Morar that was not disclosed in the paperwork
2  submitted to the lenders.

3  Zebarth testified that she met Azadegan in 2004, and started originating loans for him
4  in 2005. At first, Azadegan purchased houses through Zebarth only in his name. In time,
5  Azadegan began referring other buyers to Zebarth, and Zebarth would make illegal payments
6  to Azadegan for the referrals.

7  In 2006, Zebarth met Ionutescu. She testified that she had occasion to handle loans
8  for buyers that were referred to her by Ionutescu two or three times. Ionutescu would call
9  her with a borrower's information to pre-qualify them or, most of the time, Azadegan would
10 call to pre-qualify a borrower. The three would then meet at Starbucks. Zebarth testified,
11 however, that Ionutescu would not provide her with the borrower's qualifications. Instead,
12 the buyers themselves would provide their personal information to Zebarth. Zebarth also
13 stated that she did not know what Ionutescu's role in any of these transactions was.

14 Several other of Zebarth's statements suggested possible wrongdoing on Ionutescu's
15 part. Zebarth stated that she had a conversation with a Christian Lasar in which Lasar told
16 Zebarth that Azadegan and Ionutescu had agreed to make his mortgage payments, but the
17 payments were never made. Zebarth afterward had a conversation with Ionutescu in which
18 Ionutescu told Zebarth that he was not going to make the payments on Lasar's mortgage
19 because the house was not worth wasting money on. Zebarth also testified that she was
20 aware of third party assignments to CBI Custom Builders, Ionutescu's remodeling company,
21 that were justified as repair costs, but that were not reflected in the purchase contracts.
22 Finally, Zebarth also stated that at some point she "stopped doing straw buyers" for Ionutescu
23 and Azadegan.

### 3. Video Recording

25 The jury also heard the video recording of the discussion between Ionutescu,
26 O'Carrol, and the undercover agent. As noted, the recording was ultimately exculpatory.

### 4. False Rent Verifications

The most serious evidence against Ionutescu are two rent verifications with allegedly false information that appear to bear Ionutescu's signature. The government introduced two faxes, apparently sent within a minute of each other, bearing the date November 1, 2006, that verify that Bunea was a tenant at two different properties. The first fax indicates that Bunea was a tenant at 10626 N Miller Rd, Scottsdale, AZ 85260 from August 2004 to March 2006, and that she paid $3,500 per month in rent. The second fax indicates that Bunea was a tenant at 8327 E. Desert Cove, Scottsdale, AZ 85260 from March 2006 to August 2006, and that she paid $3,500 per month in rent. The faxes also contain a hand written note from a Laurie S. explaining that she spoke with Mr. Ionutescu and verified the rental amount on one property and the timeliness of the rental payments on both properties.

These rent verifications were used in the purchase of 4933 W Fallen Leaf, Glendale AZ. The sale of that property resulted in $180,000 cash back for Morar. To prove that the information in the rent verifications was false, the government relied upon the testimony of an FBI agent and of Azadegan. The agent visited 10620 N Miller Road around the time that the video was made in February 2008, and again the day before he testified at trial in October 2009. The agent testified that the house at 10620 N Miller Road did not appear to be habitable. The agent also testified that there was nothing labeled 10626 N Miller Road, which was the address actually listed in the rent verification form. However, because the agent only visited the Miller Road house nearly a year and a half after the end of the period stated in the rent verification form, the agent's testimony cannot be conclusive as to whether the house at Miller Road was habitable during the period stated in the form.

The government also asked Azadegan about the Miller Road address. Azadegan explained that the Miller Road house was Ionutescu's primary residence before he tore it down to build a bigger house in it. Azadegan testified that "when he was first hanging around [Ionutescu]" the house "was like a shell," and that Ionutescu had been living in a room in the back of the house. From there, Ionutescu moved to Desert Cove and began demolishing the house on Miller Road. The government also asked Azadegan whether

Ionutescu had rented the house. Azadegan responded, "No," and explained that the house was not livable "at the time" because Ionutescu had "already taken the roof off and the stuff on the property." The only allusion to a time frame in Azadegan's testimony is the statement that the house "was like a shell" when he first "was hanging around [Ionutescu]." Azadegan's previous testimony established that he first met Ionutescu in 2004 and began doing business with him within two months. Although it lacks precision, Azadegan's testimony suggests that the Miller Road address was not livable during the period stated in the form, and that consequently the information in the form was false. No evidence was presented with respect to the Desert Cove address listed in the second fax.

### 5. Rule 29 Ruling

Viewing the evidence in the light most favorable to the government, a reasonable jury could not have found that the government proved beyond a reasonable doubt that Ionutescu had knowledge of the conspiracy charged in the indictment and acted in furtherance of it. "Without the knowledge, the intent cannot exist. . . . Furthermore, to establish the intent, the evidence of knowledge must be clear, not equivocal." *Ingram v. United States*, 360 U.S. 672, 680 (1959) (quoting *Direct Sales Co. v. United States*, 319 U.S. 703, 711 (1943)).

Azadegan's testimony does not connect Ionutescu to the conspiracy charged by the government. Azadegan testified that Ionutescu introduced him to the Dobos's because Azadegan was having difficulty selling his houses. Ionutescu referred to the Dobos's as investors who wanted to convert properties into assisted living homes. Nothing in this testimony suggests that Ionutescu had knowledge of the purpose of the conspiracy–to recruit straw buyers to enable Morar to receive cash back. In fact, Azadegan testified that Ionutescu began work in the houses to turn them into assisted living homes, suggesting that Ionutescu may have believed that the Dobos's did not simply intend to take the money and allow the houses to go into foreclosure. Moreover, Azadegan never mentioned that Ionutescu played any part in the sales to Babeti, other than doing construction work on the properties. While the business partnership between Azadegan and Ionutescu suggests that Ionutescu may have been aware of the details of these transactions, there is nothing in Azadegan's testimony that

corroborates that Ionutescu had such knowledge. "Mere casual association with conspiring people is not enough. . . . Merely being present at the scene of a crime or merely knowing that a crime is being committed or is about to be committed is not sufficient conduct to find that a defendant committed that crime." *United States v. Estrada-Macias*, 218 F.3d 1064, 1066 (9th Cir. 1998) (internal citations omitted).

Azadegan's testimony that he did third party assignments involving Ionutescu also does not connect Ionutescu to the conspiracy. The government did not elicit testimony concerning those transactions, and therefore there is no way of knowing whether these transactions were linked to those alleged in the indictment. With respect to the false rent verifications, Azadegan never explicitly stated that the verifications Ionutescu prepared were false. Further, Azadegan testified that he had never actually seen Ionutescu sign off on any rent verifications. Azadegan's testimony simply does not establish that Ionutescu had knowledge of the conspiracy.

Zebarth's testimony also fails to establish that Ionutescu had knowledge of the conspiracy. Zebarth testified that she handled loans for buyers referred to her by Ionutescu and that, at some point, she "stopped doing straw buyers" for Ionutescu and Azadegan. But the government did not develop that testimony to elicit who those buyers were. There is no indication in Zebarth's testimony that the buyers that Ionutescu referred to Zebarth are the same buyers that participated in the illegal transactions alleged in the indictment. Similarly, although Zebarth testified that she met with Azadegan and Ionutescu on a number of occasions at Starbucks to discuss purchasers being referred to her, the content of those conversations is not elaborated. There is no testimony that illegal conduct was discussed in any of those meetings.

Zebarth's alleged awareness of third party assignments being made to CBI Custom Builders is also unhelpful. According to Zebarth, these were justified as repair costs, but were not reflected in the purchase contracts. However, no evidence was introduced of Ionutescu ever getting cash back on any of the transactions alleged in the indictment or otherwise. And no evidence was presented linking these transactions to purchases made by

straw buyers that resulted in cash back to Morar. The discussion regarding Christian Lasar is similarly unavailing. No link is ever established between Ionutescu's alleged arrangement to pay Lasar's mortgage and the transactions alleged in the indictment.

The video recording between the FBI agent, O'Carrol, and Ionutescu does tend to show that Ionutescu is familiar with cash back transactions, but it also does not tie Ionutescu to the conspiracy. Ionutescu clearly stated that any cash back to the agent had to be disclosed to the bank because to do otherwise would be illegal. That statement tends to show that he did not have the intent to defraud. In any event, as explained above, the video should have been excluded from evidence, and therefore it cannot support the verdict.

The false rent verification does connect Ionutescu to a transaction that resulted in cash back to Morar, namely the sale of 4933 W Fallen Leaf Lane, but also fails to establish knowledge. Bunea, the person listed as the tenant in the form, was Morar's girlfriend, and acted as a buyer of many of the properties listed in the indictment. A false rent verification would permit an inference that Ionutescu knew that he was assisting Bunea to fraudulently obtain a loan for the Fallen Leaf property. But the false rent verification does not show that Ionutescu had knowledge that Morar would get cash back. It also does not show that Ionutescu knew that the cash back would not be disclosed to the lender, or that Ionutescu knew that Bunea was engaged in repeated, similar transactions.

The evidence presented, in particular, the testimony of Zebarth and Azadegan, may very well suggest that Ionutescu engaged in some independent wrongdoing involving cash back to his company that was not disclosed to lenders. The false rent verification goes further and implicates Ionutescu in a fraudulent transaction that helped further the conspiracy. However, this is not sufficient to establish that Ionutescu had knowledge of the purpose of the conspiracy beyond a reasonable doubt. That the incidental effects of a defendant's actions further a conspiracy does not confer upon the defendant the *mens rea* of accomplishing the object of the conspiracy. *See United States v. Licciardi*, 30 F.3d 1127, 1132 (9th Cir. 1994). The evidence in this case falls short of establishing beyond a

reasonable doubt that Ionutescu was aware of a scheme to extract money from banks in the form of concealed cash back payments to Morar through the use of straw buyers.

### 6. Rule 33 Ruling

In the alternative, Ionutescu should be granted a new trial as to Count 7. The government failed to develop the testimony of Zebarth and Azadegan to establish whether Ionutescu had knowledge of the scheme to provide lenders false information about borrowers and to conceal cash back payments to Morar. The falsity of the rent verifications also stands on shaky ground, and at most would support only a very weak inference that Ionutescu was aware of the purpose of the conspiracy. Ionutescu's association with some of the direct participants in the conspiracy, such as the Dobos's, Zebarth, Bunea, and Azadegan is suspicious, but does not evince participation in the conspiracy. The government's evidence was simply too thin for the verdict to be just.

## VI. Count 1 - Wire Fraud in Connection with 6325 E. Sweetwater Ave Property

Count 1 charges Ionutescu with wire fraud in violation of 18 U.S.C. § 1343 in connection with the sale of 6325 E. Sweetwater Ave. The government relies upon two theories of liability, namely *Pinkerton*, and aiding and abetting liability in violation of 18 U.S.C. § 2.

The elements of wire fraud are: (1) proof of a scheme to defraud; (2) using the wires to further the fraudulent scheme; and (3) specific intent to defraud. *Sullivan*, 522 F.3d at 974. Aiding and abetting federal offenses is prohibited by 18 U.S.C. § 2, and the jury was instructed on this theory of liability. The government, however, presented no evidence that Ionutescu participated in the transaction involving 6325 E. Sweetwater Ave. The only connection between Ionutescu and that transaction appears to be that Ionutescu referred Azadegan to the Dobos's and that Azadegan eventually sold that property to Babeti, with cash back to Morar. There were three other references at trial to the 6325 E. Sweetwater property, two of which were documentary. The first is an invoice dated May 25, 2005 for $400 paid to CBI Custom Builders for pool repairs, admitted as part of exhibit 182. However, the conspiracy alleged did not begin until 2006, and the fact that Ionutescu

- 13 -

performed repairs at the property does not link him to any unlawful conduct. Furthermore, as explained above, exhibit 182 should have been excluded from evidence. The second consists of two checks introduced as exhibits 171-46 and 171-49, one for $15,000 from June 28, 2006, and the other for $9,000 from August 2, 2006 paid to CBI for construction work on the property. Again, there is no allegation in the indictment that there was any fraud in connection with repairs that were performed by Ionutescu or by CBI. The only other reference in the trial to a Sweetwater property in connection with Ionutescu was testimony by Azadegan that there may have been some agreement between Azadegan and Ionutescu that Azadegan would pay back a debt to Ionutescu from the proceeds of the sale of one of two Sweetwater properties that Azadegan owned. However, Azadegan could not remember which Sweetwater property the agreement referred to.

"Conviction as an aider and abettor requires proof the defendant willingly associated himself with the venture and participated therein as something he wished to bring about." *United States v. Insunza*, 580 F.3d 894, 912 (9th Cir. 2009) (quoting *United States v. Zemek*, 634 F.2d 1159, 1174 (9th Cir. 1980)). "A defendant to be an aider and abetter must know that the activity condemned by law is actually occurring and must intend to help the perpetrator." *United States v. McDaniel*, 545 F.2d 642, 644 (9th Cir. 1976). No reasonable jury could draw the inference, based upon the introduction to the Dobos's, that Ionutescu knew of or intended that the fraudulent transaction involving 6325 E. Sweetwater occur. Azadegan's confused testimony of a possible agreement to give money to Ionutescu from the proceeds of the sale of one of two Sweetwater properties also does not suggest that Ionutescu knew that the sale of 6325 E. Sweetwater would involve fraud.

The government therefore necessarily relies on *Pinkerton* liability to establish Ionutescu's guilt. *See United States v. Pinkerton*, 328 U.S. 640 (1946). Under *Pinkerton*, when a substantive offense is committed by one conspirator, his co-conspirators are also liable for the substantive offense so long as the conspiracy is ongoing and the offense was committed in furtherance of the conspiracy. *United States v. Nelson*, 66 F.3d 1036, 1044 (9th Cir. 1995). Here, however, the evidence was not sufficient to show that Ionutescu was a

member of the conspiracy. As a result, *Pinkerton* is inapplicable. The government therefore did not produce sufficient evidence for a reasonable jury to find Ionutescu guilty beyond a reasonable doubt of Count 1.

In the alternative, Ionutescu should be granted a new trial. The evidence heavily weighs against aider and abetter liability because the only evidence that could support this theory was Ionutescu's introduction of Azadegan to the Dobos's and the jumbled testimony of Azadegan, who was not even sure whether he was referring to the same property alleged in the indictment. The great weight of the evidence is also against finding *Pinkerton* liability because the evidence of Ionutescu's knowledge of the underlying conspiracy, as explained above, is insufficient or scant at best.

**VII. Count 5 - Wire Fraud In Connection With 4933 W Fallen Leaf Property**

**A. Rule 29 Ruling**

Count 5 charges Ionutescu with wire fraud in violation of 18 U.S.C. § 1343 in connection with the sale of 4933 W Fallen Leaf. The government charged both aider and abetter liability in violation of 18 U.S.C. § 2 and *Pinkerton* liability. As with Count 1, the *Pinkerton* theory fails because there was insufficient evidence to find that Ionutescu was a member of the conspiracy.

However, drawing all inferences in favor of the government, there was sufficient evidence to convict on Count 5 under an aiding and abetting theory of liability. To prove wire fraud, the government must show that the defendant (1) entered into a scheme to defraud; (2) used the wires to further the fraudulent scheme; and (3) had the specific intent to defraud. *Sullivan*, 522 F.3d at 974. The elements of aiding and abetting are (1) that the accused had the specific intent to facilitate the commission of a crime by another; (2) that the accused had the requisite intent of the underlying substantive offense; (3) that the accused assisted or participated in the commission of the underlying offense; and (4) that someone committed the underlying substantive offense. *United States v. Gaskins*, 849 F.2d 454, 459 (9th Cir. 1988).

The jury could have concluded that Ionutescu aided and abetted the fraudulent transaction involving 4933 Fallen Leaf from the fact that he signed a false rent verification on behalf of Bunea. The jury could have reasoned that Ionutescu knew that the bank would rely upon the false statements in Bunea's loan application, including the false rent verification, in deciding whether to extend the loan. The jury could also have concluded, from the fact that Ionutescu made false statements, that Ionutescu had the specific intent to defraud required by the wire fraud statute. *See United States v. Cloud*, 872 F.2d, 846, 851 (9th Cir. 1989) (the defendant's calculated decision to sign escrow instructions containing materially false statements, knowing that the victim bank could be deceived by the statements, furnished sufficient circumstantial evidence of an intent to defraud for a jury to convict of bank fraud). Ionutescu participated in the crime by providing the rent verification, and the government proved that the underlying offense, wire fraud, was committed.

The government did not need to show that Ionutescu knew or understood all of the details of the transaction or that Morar would be receiving cash back. "It is immaterial that [the defendant] did not know all the details of the crime, or all of the persons who were perpetrating the crime[.] Neither is it necessary that [the defendant] have an active stake in the outcome of the crime, or that there was an agreement between [the defendant] and the [principals]. It is enough that [the defendant] acted with criminal intent and design to assist the perpetrators of the crime." *United States v. Lane*, 514 F.2d 22, 27 (9th Cir. 1975) (internal citations omitted). Even if Ionutescu was unaware of the cash back to Morar, the jury could have inferred that he acted with the intent to defraud by providing false information that he knew would be used to fraudulently obtain a loan. Thus, the evidence presented was sufficient to sustain a conviction on Count 5.

**B.     Rule 33 Ruling**

Although the evidence was theoretically sufficient to sustain the conviction, it weighs heavily against the verdict. The false rent verifications and the video are the only evidence that supported the conviction.

### 1. False Rent Verification

The government only introduced evidence that one of the rent verifications was false, namely, the one for address 10626 N Miller Rd. No evidence was introduced that Ionutescu benefitted from the sale of the Fallen Leaf property.

In addition, while admissible as evidence, the probative value of the rent verification is suspect. First, the only evidence that established that the information in the rent verification form was in fact false was Azadegan's testimony to the effect that the house was "like a shell" when he "first started hanging around Cipriano," and that therefore the house was not being rented. The government did not elicit any specific dates in connection with these statements, although it can be inferred from the fact that Azadegan met Ionutescu in 2004 that his statement covers at least part of the period during which the form indicates that Bunea was a tenant. Second, there is a notation on the forms from a Laurie S. to the effect that she spoke with Ionutescu and verified the rental amounts for the property. However, the government never called Laurie S. to explain how her signature came to be on the form or to verify that Ionutescu had provided the information alleged. Third, neither form was signed by Bunea, the applicant. Finally, no person or representative of any of the other persons connected to the Fallen Leaf transaction, including the real estate person (Swallows), the lender (AHM Mortgage), the broker (Royal Financial), the loan officer (David Nerland), the seller (Ralph Verdino), or the buyer (Bunea), was called as a witness by the government at trial to discuss the rent verifications or otherwise.

### 2. Video

As explained above, the video of the undercover agent, O'Carrol, and Ionutescu should have been excluded. In light of its minimal probative value and of the potential for prejudice, the admission of the video cannot support the verdict.

In light of the weakness of the evidence, a serious miscarriage of justice may have occurred. The Motion for New Trial on Count 5 will be granted.

IT IS THEREFORE ORDERED Defendant Ionutescu's Motion to Exclude Evidence (doc. #419) is granted to the extent stated in this order.

IT IS FURTHER ORDERED that Defendant Ionutescu's Motion for Judgment of Acquittal (doc. #486) is granted as to Counts 1 and 7 and denied as to Count 5 of the Superseding Indictment.

IT IS FURTHER ORDERED that the Motion for New Trial (doc. #487) is granted as to Count 5 and is granted as to Counts 1 and 7 of the Superseding Indictment in the alternative to judgment of acquittal.

IT IS FURTHER ORDERED that the Motion to Hold Rule 29 Decision in Abeyance (doc. #446) is denied as moot.

IT IS FURTHER ORDERED that Defendant Ionutescu's Renewal of Rule 29 Motion for Judgment of Acquittal, Motion for New Trial Pursuant to Rule 33, and Motion for Extension of Time Pursuant to Rule 45 (doc. #459) is granted to the extent stated in this order and in the Court's November 2, 2009 order (doc. #464).

DATED this 21st day of December 2009.

_____
Neil V. Wake
United States District Judge